Argued and submitted January 15, affirmed July 2, reconsideration denied August 21, petition for review allowed September 30, 1986 (302 Or 35)

PLEMEL et al,
*Respondents,*

*v.*

WALTER,
*Appellant.*

(549; CA A34015)

721 P2d 474

Daniel Hoarfrost, Portland, argued the cause and filed the brief for appellant.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondent State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

No appearance for respondent Dena Ann Plemel.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

Mother brought this filiation proceeding to establish that respondent is the father of her child born June 9, 1983. Dr. Lovrien and his staff at the Oregon Health Sciences University Medical Genetics Laboratory performed red cell enzyme blood tests on mother, respondent and the child. At the hearing, Lovrien testified concerning (1) the probability that the tests would exclude a falsely accused father; (2) the "paternity index"; and (3) the "chance of paternity." Respondent does not challenge the scientific reliability of the blood test techniques or the correctness of the computations Lovrien made using the test results. He challenges only the relevance of evidence concerning the "paternity index" and the "chance of paternity" and assigns error to the trial court's overruling of his objection to the admission of that evidence. We affirm.

ORS 109.258 provides that evidence based on blood test results which shows the possibility of the alleged father's paternity is admissible within the discretion of the judge. The tests performed under Lovrien's direction involved 19 inherited blood characteristics. On the basis of the frequency of those traits and the genetic makeup of the parties, the tests showed that respondent belongs to 2.5 percent of the population of Oregon men who would be compatible biologically with the child's blood characteristics. The probability that the tests exclude from paternity a falsely accused father is 97.5 percent. Respondent concedes that that evidence is probative, and he has no objection to it.

We now turn to that evidence which respondent claims is objectionable. The "paternity index" measures the *odds* of respondent fitting within the population of Oregon men who would be compatible with the child biologically.[1] Lovrien testified that, given the estimated gene frequencies, it is 178 times more likely that respondent, rather than a random man, would father a child of the gene makeup

---

[1] Each trait occurs with a certain frequency in the population. As to each trait, based on the frequency of occurrence and on respondent's genetic makeup, it is either more or less likely that the child received the gene from respondent than from a random man. For example, it is 7.6 times more likely that the child received the B gene of his AB blood type from respondent than from a random man. The "paternity index" is derived by multiplying together the "odds" for each of the 19 characteristics tested.

observed in the child. The "chance of paternity" expresses the probability of paternity as a percentage, incorporating the odds shown by the paternity index.[2] Lovrien testified that the chance of paternity calculation indicates that there is a 99.4 percent chance that respondent, or a man possessing his genetic blood traits, is the father of the child.

Respondent finds fault with the use of the chance of paternity calculation on the ground that it arbitrarily assumes the pretesting likelihood of paternity to be 1 to 1. That is, the formula is premised on the assumption that the odds are at least equal that the mother has accused the correct father. In fact, as the paternity index shows, that assumption was, if anything, unduly favorable to father.

Respondent complains that the paternity index and chance of paternity calculations are not helpful to the jury and do nothing to distinguish respondent from any of the other men within the group of men who are compatible with the child's blood characteristics. The calculations merely express the odds of respondent falling within that group. Further, respondent argues that they mislead the jury into relying too heavily on the test results.

We conclude that the calculations are relevant; they provide information to assist the jury in determining whether respondent is the father of the child. The evidence helps the jury in interpreting the significance of the blood test results. We are satisfied that any potential for confusion was minimized by Lovrien's testimony. On cross-examination, he acknowledged and explained the limited significance of each calculation. He testified that the calculations do not differentiate between respondent and any others in the group of men whose blood would be compatible with the child's. He also made it clear that the calculations do not prove paternity,

---

[2] The "chance of paternity" is calculated by use of Baye's Formula. The calculation assumes a pretesting chance of paternity of 1 to 1. It is presumed that, apart from the test results, it is just as likely as not that respondent is the father of the child. McCormick, Evidence § 211 (3d ed 1984). Lovrien testified that the formula assumes that the most logical father is the alleged father. The paternity index derived from the testing, in this case 178, is plugged into the formula:

$1/(178 + 1) = .06$ chance of nonpaternity
$100 - .06 = 99.4$ chance of paternity

but only help the jury to understand and evaluate paternity tests.

We hold that the trial judge did not abuse his discretion in admitting the evidence.[3] *Carter v. Moberly,* 263 Or 193, 501 P2d 1276 (1972).

Affirmed.

---

[3] A useful discussion of the use and potential misuse of paternity blood test evidence is contained in McCormick, Evidence, *supra.*