Argued and submitted September 30, 1992, resubmitted In Banc July 14, affirmed
September 15, 1993

## STATE OF OREGON,
*Respondent,*

*v.*

## HERBERT JACKSON FUTCH,
*Appellant.*

## (CC88-1270; CA A67775)

860 P2d 264

David K. Allen, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

EDMONDS, J.

Riggs, J., dissenting.

**EDMONDS, J.**

Defendant appeals his convictions for aggravated murder, ORS 163.095(1)(d), and sodomy in the first degree, ORS 163.405. He makes multiple assignments of error. We affirm.

Defendant's convictions resulted from the murder of an elderly woman in April of 1988 in Seaside. The victim was last seen alive at about 5:30 p.m. on April 1, and her body was discovered shortly after 1 p.m. on April 2 in her home. Defendant was her next door neighbor. After the murder, he was arrested as a result of outstanding warrants in Umatilla County and the investigation of defendant's involvement continued while he was in custody pursuant to those warrants.

The first assignment of error is that the trial court erred in denying defendant's motion to suppress the evidence seized pursuant to a search warrant. The "affidavit" in support of the application for the warrant contains references to the results of a polygraph examination taken by defendant. Defendant's second assignment of error is:

> "The trial court erred in denying defendant's motion to suppress the evidence, on the ground that his consent to take a polygraph examination had been coerced, that the examination results should have been suppressed, and that without the evidence of the polygraph examinations, the search warrant application failed to establish probable cause."

Defendant argues that the "affidavit" did not establish probable cause.

In reviewing the issuance of a search warrant, we give deference to the issuing court's determination of probable cause. *State v. Prince*, 93 Or App 106, 112, 760 P2d 1356, *rev den* 307 Or 246 (1988). The sufficiency of an application for a search warrant depends not only on the facts asserted but also on reasonable inferences that may be drawn from those facts. *State v. Ingram*, 251 Or 324, 326, 445 P2d 503 (1968). In order to issue a search warrant, the issuing magistrate must determine that "on the basis of the record before him, there is probable cause to believe that the search will discover things specified in the application and subject to seizure." ORS 133.555(2). "Probable cause" as used in ORS

133.555(2) means that the facts on which the warrant is premised must lead a reasonable person to believe that seizable things will probably be found in the location to be searched or, in the context of this case, evidence that would tie defendant to the commission of the crime. *See State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984).

The "affidavit" in support of the application for a search warrant in this case was not a written affidavit, but a sworn oral statement made to the issuing judge pursuant to ORS 133.545(5).[1] The evidence that is the subject of defendant's motion to suppress is a sample of defendant's blood that was seized pursuant to the search warrant. A sample of deoxyribonucleic acid (DNA) was extracted from the seized blood and was later used as a basis of comparison with DNA extracted from semen stains found at the murder scene. The admissibility of the DNA evidence is the subject of defendant's later assignments of error. For the purpose of our analysis of defendant's first assignment of error, we will assume that references to the results of the polygraph examinations in the sworn statement in support of the application for the search warrant have been excised.

■ The sworn statement relates the following information. The victim probably was murdered during the night of April 1-2. She had been strangled, her neck broken, and probably had been the victim of a sexual assault. Semen stains were found on the sheets. Defendant lived in the other half of the duplex occupied by the victim. The duplex had a common laundry room, and defendant knew the victim. As part of their investigation, the police interviewed defendant. He told them that on the night in question, he got off work at around midnight and drank in two bars until closing time. He said that because he was drunk, he did not remember what time he arrived at his girlfriend's apartment that night. His

---

[1] ORS 133.545(5) provides:

"Instead of the written affidavit described in subsection (4) of this section, the judge may take an oral statement under oath when circumstances exist making it impracticable for a district attorney or police officer to obtain a warrant in person. The oral statement shall be recorded and transcribed. The transcribed statement shall be considered to be an affidavit for the purposes of this section. In such cases, the recording of the sworn oral statement and the transcribed statement shall be certified by the judge receiving it and shall be retained as a part of the record of proceedings for the issuance of the warrant."

girlfriend told the police that defendant had told her that he "got home about 3 a.m." Defendant said that the next day he saw a window screen from the victim's side of the duplex lying on the ground, and that he "picked it up, and tried to put it back on the window." Two other witnesses who had been with defendant told the police that although defendant saw the screen on the ground, he did not touch the screen with his fingers. Defendant also said that his roommate had called him after the murder and had told him that the victim had been strangled, and that he had heard that the victim and her son engage in "loud arguments." The roommate told the police that he had not told defendant that the victim had been strangled, and he denied making any comment about alleged arguments between the victim and her son. When defendant first spoke to the police, he said that he had been in the victim's side of the duplex in the past helping her with laundry or groceries but denied that he had ever been in her bedroom. However, he told the polygraph examiner that he had been in the victim's bedroom, and that he had put clothes on her dresser for her.

After the polygraph examination, defendant began to cry. The officer described the interview to the issuing magistrate at that point as follows:

"[H]e [defendant] would start crying again and then he would say, [']Steve I've killed somebody.['] And then I've [*sic*] come back and asked him exactly what you're feeling, what you're thinking about, more things coming back to you. And then he'd say, well then he'd continue to cry some more and says, [']well, I killed somebody because you're telling me I killed somebody.['] Uh, uh, he calmed down after 5 or 10 minutes, he calmed down, I got him a cup of coffee and he relaxes a little bit, and he looks at me and he says [']Steve,['] he says [']you know, Saturday morning when I picked up that screen I knew that something was wrong but I did not know. I felt funny, I felt strange about picking up the screen and doing what I did with the screen, and now I know, now I know why.['] Uh, he continued to totally deny any involvement in, in, causing any injury to the victim. He denied uh, any knowledge about being at the Shilo. He denied anything about any memory recall after supposedly leaving Pudgy's restaurant."

The officer making the application also told the issuing magistrate that the police had located semen on the victim

and on the bedding in her room, and that fiber, hairs and semen samples were available for purposes of comparison. The officer informed the issuing magistrate that the State Police Crime Laboratory had the ability to compare those samples with chemical substances from a suspect's blood, and that the comparison would aid in the identification of the perpetrator of the crime.

Excluding the polygraph evidence, the sworn statement in support of the application for the search warrant contains facts sufficient to support probable cause for the issuance of the warrant. Defendant's connection to the crime scene, his admission that he had "killed somebody," the fact that he knew that the victim had been strangled when his roommate had not told him about that fact, and the fact that he offered a false explanation as to why the window screen might contain his finger prints suffice to give the issuing magistrate probable cause to believe that the seizure of defendant's blood would produce evidence probative to the investigation about who committed the crime. In the light of the fact that the application is sufficient when the polygraph evidence is excluded, we need not decide defendant's second assignment of error. The search warrant was issued lawfully, and defendant's motion to suppress the evidence seized pursuant to the warrant was denied properly.

Defendant's next three assignments of error are: (1) the trial court erred in holding the state's evidence of identification based on DNA testing to be admissible; (2) the trial court erred in allowing evidence of the DNA testing laboratory's use of "monomorphic probes" to validate the reliability of the DNA test results; and (3) the trial court erred in allowing "insufficiently-substantiated" expert testimony as to the statistical certainty of the state's identification of defendant.

DNA is the active substance in human genes and occurs in all cells that have a nucleus, including white blood cells, sperm, cells surrounding hair roots and cells in saliva. Human genes are carried in 23 pairs of chromosomes, which are long thread-like or rod-like structures that are a person's archive of heredity. One chromosome of each pair is inherited from each parent and the chromosomes make up the deoxyribonucleic acid, or DNA molecule in the human body. Except

for identical twins, the DNA of a person is unique. The DNA test methodology involves the examination of the DNA molecule and the identification of certain selected pieces of the molecule. A DNA sample is taken from a victim or from a suspect and is compared with a sample taken from a crime scene to determine if the samples are said to "match." A "match" indicates that the known sample could have come from someone who also contributed the unknown sample, and the "match" is given a statistical estimate of probability. With that background, we turn to defendant's assignments of error.

First, defendant argues that the evidence of the DNA comparison between the samples seized at the crime scene and the samples taken from defendant's blood were "insufficiently reliable to be probative" because of the lack of quality controls in the testing process and an insufficient sample. He relies on the legal criteria established in *State v. Brown*, 297 Or 404, 416, 687 P2d 751 (1984), to evaluate scientific evidence. His arguments concern the admission of evidence under OEC 401,[2] OEC 402[3] and OEC 702.[4] The issue is analyzed by applying traditional evidence concepts of probity and weighing the probative value of the evidence against the possible prejudicial effect that it might have on a trier of fact under OEC 403.[5]

---

[2] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[3] OEC 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

[4] OEC 702 provides:

"If scientific, technical or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[5] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In *Brown,* the court listed the following non-exclusive guidelines to assist in determining whether scientific evidence is probative under OEC 401 and helpful to the trier of fact under OEC 702:

"(1)  The technique's general acceptance in the field;

"(2)  The expert's qualifications and stature;

"(3)  The use which has been made of the technique;

"(4)  The potential rate of error;

"(5)  The existence of specialized literature;

"(6)  The novelty of the invention; and

"(7)  The extent to which the technique relies on the subjective interpretation of the expert." 297 Or at 417.

In applying those factors, the court warned:

"The existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."[6] 297 Or at 417. (Footnotes omitted.)

---

[6] The court also said that the factors it listed as guidelines are not the only factors

"which may be considered. Justice McCormick lists 11 factors in his article *Scientific Evidence: Defining a New Approach to Admissibility*, 67 Iowa L Rev 879, 911-12 (1982):

"(1)  The potential error rate in using the technique;

"(2)  The existence and maintenance of standards governing its use;

"(3)  Presence of safeguards in the characteristics of the technique;

"(4)  Analogy to other scientific techniques whose results are admissible;

"(5)  The extent to which the the [*sic*] technique has been accepted by scientists in the field involved;

"(6)  The nature and breadth of the inference adduced;

"(7)  The clarity and simplicity with which the technique can be described and its results explained;

"(8)  The extent to which the basic data are verifiable by the court and jury;

"(9)  The availability of other experts to test and evaluate the technique;

"(10)  The probative significance of the evidence in the circumstances of the case; and

"(11)  The care with which the technique was employed in the case." 297 Or at 417 n 5.

After applying the above guidelines, the court concluded that polygraph evidence may possess some probative value and may, in some cases, be helpful to the trier of fact. The court then weighed the probative value of such evidence against its prejudicial effect. It determined that, although polygraph evidence possesses some relevance, its probative value is substantially outweighed by the danger of unfair prejudice and the potential for confusing the issues and misleading the jury. It said:

"Polygraph evidence may well divert the trier of fact from the direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence. Polygraph evidence is not just another form of scientific evidence presented by experts such as ballistics analysis, fingerprint and handwriting comparisons, blood typing and neutron activation analysis. These other tests do not purport to indicate with any degree of certainty that the witness was or was not credible. By its very nature the polygraph purports to measure truthfulness and deception, the very essence of the jury's role." 297 Or at 440. (Footnote omitted.)

We conduct our analysis of defendant's argument that the DNA test results are not admissible under OEC 401, OEC 702 and OEC 403 by applying the *Brown* guidelines in a manner similar to that used by the Supreme Court in that case. However, the threshold question is what issues are properly before us. In *Brown*, the Supreme Court said:

"Notwithstanding the usual deference to trial court discretion, we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code." 297 Or at 442.

Similarly, in *Plemel v. Walter*, 303 Or 262, 277, 735 P2d 1209 (1987), the court said:

"Where the determination whether the probative value of evidence is substantially outweighed by the dangers set forth in OEC 403 must be made on a case-by-case basis, we ordinarily defer to the determination of the trial court. * * * We conclude that this is not such a case. The probative value of [the evidence at issue] and the dangers in [its] presentation to the trier of fact will be substantially the same in every case. This court, as an appellate court, should determine the admissibility of this evidence." (Citation omitted; footnote omitted.)

■ We understand those statements to mean that we may determine whether particular scientific evidence is generally admissible as well as whether it is admissible on a case-by-case basis. Even though scientific evidence of a particular kind may be generally admissible, the specific facts of a case may demonstrate that the particular evidence offered is inadmissible. To that end, we commence by first determining whether DNA evidence is generally admissible in Oregon courts.

■ Although defendant's experts fault the methodology used by the laboratory in this case, numerous highly qualified and well-respected authorities agree that the theories underlying forensic DNA typing are generally accepted in the scientific world as a means of identification of the source of body substances. Defendant concedes as much. Since DNA was first identified in the 1940s, there has been considerable research concerning its use as a tool for identification. Much research and discussion surrounding DNA appears in a variety of professional journals, law reviews, and government publications. For instance, one such publication concludes that "forensic uses of DNA tests are both reliable and valid when properly performed and analyzed by skilled personnel." *The Genetic Witness: Forensic Uses of DNA Tests*, Congress of the United States, Office of Technology Assessment, 7 (1990). That same publication reports that, since its introduction in 1986 into criminal proceedings,

> *"forensic DNA analysis has since been admitted into evidence in at least 185 cases by 38 States and the U.S. military as of January 1, 1990.* This number does not reflect its even wider use in investigations that did not go to trial; although impossible to precisely determine, [the Office of Technology Assessment (OTA)] estimates that, to date, DNA tests have been used by law enforcement in over 2,000 investigations. *OTA found DNA tests were used for criminal investigations and proceedings in at least 45 States and the District of Columbia as of January 1, 1990.* Nor do the numbers reflect the use of DNA tests in thousands of paternity disputes annually." *The Genetic Witness: Forensic Uses of DNA Tests*, Congress of the United States, Office of Technology Assessment, 14 (1990). (Emphasis in original; citations omitted.)

Moreover, when DNA evidence is offered, both the testing protocol used by the laboratory and the test results are

available for objective review. We conclude that forensic DNA testing in general has sufficient scientific reliability so as to have probative value and could be helpful to the trier of fact in determining issues of identification.

■     The only remaining question regarding the admissibility of DNA evidence in general is whether the probative value of DNA evidence is outweighed by its prejudicial effect under OEC 403. In *Brown*, the court said:

> "This rule [OEC 403] requires trial courts and, in some cases, appellate courts to evaluate the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment." 297 Or at 439.

DNA evidence is similar to other objective scientific evidence that commonly is admitted into evidence in criminal trials such as handwriting analysis, blood typing, fingerprint comparison, ballistic comparisons, hair sample comparisons, or comparisons of the physical properties of objects such as threads from clothing. Unlike polygraph evidence, which was the subject of the court's opinion in *Brown*, DNA evidence does not directly comment on the credibility of the defendant or invade the very essence of the jury's role. The evidence is not infallible, nor would it necessarily be considered as such by the trier of fact. Because of the availability of cross-examination and the defendant's ability to call other witnesses to rebut the opinions expressed by the prosecution's witnesses, the potential problem that the jury may be overly impressed by the aura of reliability of the evidence is lessened. The evidence may lead a jury to exonerate a defendant as well as to convict, and therefore could be meaningful evidence to the trier of fact. Rather than causing the trier of fact to abdicate its role of critical assessment, it enhances the ability of the jury to perform its constitutional function. Because of those factors and because it is the type of evidence that has been historically admitted into evidence in Oregon courts, we hold that DNA evidence is generally admissible under OEC 403.[7]

---

[7] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US ____, 113 S Ct 2786, 125 L Ed 2d 469 (1993), the Court considered FRE 402 and FRE 702. FRE 402 provides:

The next issue is whether under OEC 401, OEC 702, and OEC 403, the particular evidence in this case is admissible. The process that was used to compare defendant's DNA with that taken from the samples found at the crime scene is called a restriction fragment length polymorphism analysis (RFLP). Both sides offered extensive and conflicting evidence. Nine experts testified for the state about the aspects and reliability of the testing process and six experts testified for defendant. The latter criticized the testing methods and the assumptions made in calculating the significance of the "match." Depending on which experts are to be believed, the evidence could be probative and helpful to the trier of fact to determine whether defendant committed the crime. The next step is to determine whether the alleged errors in arriving at the result are so prejudicial that the probative value of the evidence is outweighed. In assessing that argument, we consider such factors as (1) the need for the evidence; (2) its persuasiveness; and (3) its inflammatory effect on the jury. *State v. Ritchie*, 50 Or App 257, 260, 622 P2d 768 (1981). In this case, the need for the evidence is obvious. There were no eye witnesses to the commission of the crime. The state's ability to identify defendant as the perpetrator depended on circumstantial evidence. Although the evidence is prejudicial to defendant, as would be any evidence offered by the state, it is not so inflammatory that it would cause the jury to "be roused to overmastering hostility." *See State v. Hockings*, 29 Or App 139, 147-48, 562 P2d 587 (1972), *rev den* 279 Or 301 (1977), *cert den* 434 US 1049 (1978).

---

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

FRE 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The Court concluded that

" 'general acceptance' is not a necessary precondition to the admissibility of scientific evidence under Federal Rules of Evidence, but the Rules of Evidence — especially Rule 702 — do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 US at ___, 113 S Ct at 2799.

Our analysis in this case is consistent with that holding.

■ That leaves an appraisal of the persuasiveness of the evidence. We must keep in mind that our role is not to "weigh" the conflicting evidence as a trier of fact would. For expert opinion evidence to be inadmissible under OEC 403, because it lacks persuasiveness and therefore is prejudicial, must mean that there is no reasonable nexus between the expert's hypothesis and the issue in the case. The RFLP testing process is the most common method used for DNA matching:

"The goal of [the RFLP] approach is to break the DNA chain into small fragments known as 'restriction fragments' to identify the fragments which contain the polymorphic segments using a genetic probe, and then to measure the length of those fragments. In samples of a given individual, the fragments identified by the probe will be the same length, while in samples from different individuals the length of these fragments is likely to differ. Hence, if the probe identifies fragments of the same length in two samples, it is evidence that the samples have a common source." Thompson & Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va L Rev 45, 64 (1989).

■ Defendant does not attack the validity of the RFLP method in general. The RFLP testing process has been in use since 1985. Rather, he asserts that the specific procedures used in this case do not guarantee reliability. His experts testified that the opinion of the testing laboratory, that the samples obtained from the crime scene and the defendant "matched," is in error and that the database used by the testing laboratory is "scientifically unacceptable." However, their testimony was controverted by testimony by the state's experts. The record is a classic example of a "battle of the experts," a phenomena not uncommon to all trials in which scientific evidence is admitted into evidence. There was expert testimony presented in both the state's and defendant's cases-in-chief, as well as on rebuttal and surrebuttal, on the validity of the testing process used in this case. Each point made was the subject of a counterpoint explaining why the point was not valid, which in turn was countered by more scientific opinion.

Defendant accurately characterizes the tenor of the record when he says:

"In the final analysis, [L]ifecodes [the testing laboratory] had either re-examined the data in this case with new

methods to account for problems identified by defense criticism or the criticism was incorrect. Dr. Beard [a prosecution witness] stood by his opinion that the samples obtained showed a match and established a connection between defendant and the victim.''

In the light of this record, we cannot say that the state's evidence, concerning the testing procedures used in this case, was so lacking that it had no weight whatsoever. Although reasonable factfinders might differ as to whether the tests performed were accurate, it would be improper for us to preempt the jury's determination of that issue on this record.

■ Defendant's next argument is that the use of a monomorphic probe by the testing laboratory to correct for bandshifting is not reliable. Again, we examine the ''persuasiveness'' of the state's evidence under OEC 403. ''Bandshifting'' describes the shift in the position of a DNA band as it is viewed by the scientist. A probe with a known length is used to check and adjust for bandshifting. By using a monomorphic probe (one with a known length), the examiner knows where the monomorphic probe should appear on the autorad (a device that provides visual comparison of the DNA bands). If it appears elsewhere, that indicates that other bands of similar lengths found at similar positions have also similarly shifted. By determining how much the position of the known probe has shifted, the amount of the shift in the other bands can be calculated.

A representative of the laboratory that did the test testified that the monomorphic probe used in this case was a ''fairly common probe that is used in other laboratories for a variety of purposes,'' and a 1982 publication describing the probe was introduced into evidence. One of defendant's experts testified that monomorphic probes were ''the best hope'' for dealing with bandshifting and that he had criticized the FBI in the past for not using such probes. By the time of trial, a technology report had been issued upholding the use of monomorphic probes and an article about the use of such probes had been accepted for publication in a peer reviewed scientific journal. In the light of that evidence, defendant's argument fails.

■ The other point of defendant's attack is the claim that the statistical evidence in this case is flawed. He says:

"The population data base on which some calculations are based is too small and does not account for substructuring which can distort the results. In the absence of near-absolute reliability, the reliability of this type of evidence does not outweigh the prejudice to defendant, which is also near absolute."

The probative value of statistical evidence based on body fluids is not a novel or new idea in this state. *See, e.g., Plemel v. Walter, supra.* The experts' opinions in this case varied as to the odds of a random "match" between defendant's DNA and the samples seized at the crime scene. For instance, one expert testified that the odds were one in 66 billion, with his most conservative estimate being one in 6.3 billion that the DNA discovered at the scene could be other than defendant's. Another testified that the statistical calculation in this case was "probably quite accurate" and that the odds that an unrelated person other than defendant had left the semen stains were "ludicrously small." She also said that the one in 6.3 billion figure was an "extraordinarily conservative way of putting an upper estimate of the odds of a match" and that it was unlikely that the odds were better than one in 16 billion. Other experts testified that the probability of a random match were one in 127 million.

One of defendant's experts testified that in a hypothetical example, the odds of a random match would be one in 116 for a given population group. Defendant asserts in his brief:

"Lifecodes actual results for one set of allele frequencies should have been one in 11, one in 19 and one in 625, generating a frequency for the aggregate pattern and the population of one in 130 thousand, not one in billions."

Even if the defendant's experts are correct in their assessment of the statistical probability involved, that probability is sufficient to make the question of a "match" a jury issue. In sum, we reject defendant's argument that the DNA evidence in this case was inadmissible.

■ In his final assignment of error, defendant argues that the trial court erred in denying his motion for a new trial

based on "newly discovered evidence." *See* ORCP 64B. He moved for.a new trial following the entry of the guilt phase verdict and before the start of the penalty phase. He concedes that making the motion at that time does not comply with ORS 136.535, which requires that the motion be made "within five days after the filing of the judgment." However, he contends that, because the state failed to raise the issue of untimeliness below and because the trial court addressed the motion on its merits, we should reach the issue that he raises. A trial judge's ruling may be correct for the wrong reason. On appeal, it is incumbent on defendant to demonstrate that the trial court erred. The trial court did not err if defendant's motion was not properly before it.

Affirmed.

**RIGGS, J.,** dissenting.

I am deeply disturbed by the majority's haste to admit novel scientific evidence of unparalleled complexity when that evidence is still in the early stages of its development and its reliability is yet unknown.[1] As it hurries to admit forensic restriction fragment length polymorphism analysis (RFLP) for forensic purposes, the majority does not apply *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), with due care and therefore errs in its analysis.

In the majority opinion, the seven *Brown* guidelines are applied to forensic DNA testing in general *but not to RFLP testing in particular.* Contrary to the majority's position that "[d]efendant does not attack the validity of the RFLP method in general," 123 Or App at 188, defendant assigns error to admission of "the state's proffered evidence of identification based on DNA testing." Read in context, this assignment of error refers to RFLP testing, as that was the only DNA evidence offered by the state.

Under *State v. Brown, supra,* we need to treat *types* of examinations, not just general fields, as novel scientific evidence. The defendant in *Brown* sought admission of a "peak of tension" polygraph test. The Supreme Court's analysis begins:

---

[1] Because defendant was tried in 1990, this court's analysis of RFLP's reliability is properly confined to what the record showed existed at that time.

"There are several different types of polygraphic examinations, each based on different assumptions and each possessed of different degrees of accuracy. If the question is asked, 'Should the results of polygraph examinations be admissible as evidence?,' the response should not be an answer, but another question: 'What type of polygraphic examination produced the results?' " 297 Or at 422.

The Supreme Court proceeded to analyze the "peak of tension" test at some length. 297 Or at 422-25. Later in the opinion, the Supreme Court criticized researchers who "do not distinguish which type of polygraph test is being evaluated." 297 Or at 428. There is no suggestion in *Brown* that had the peak of tension test been admissible, the seven other tests would be examined under the laxer standards for admission of scientific evidence which is no longer novel.

*Plemel v. Walter*, 303 Or 262, 735 P2d 1209 (1987) further supports the application of the *Brown* guidelines to RFLP testing. In *Plemel*, the Supreme Court held that because the probative value of statistics derived from blood test results and the dangers in their presentation to the trier of fact will be substantially the same in all cases, an appellate court should determine their admissibility under the *Brown* guidelines.[2] 303 Or at 278. Here, the probative value and the dangers of forensic RFLP will be the same in all cases, so the *Brown* guidelines apply.

When we apply the *Brown* guidelines to forensic RFLP, we should keep in mind the Supreme Court's statement that

"what is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence * * *." 297 Or at 418.

It is also important not to let the guidelines blind us to the ultimate issue: has the proponent established that the novel scientific evidence is reliable. 297 Or at 418 n 6.

---

[2] The *Brown* and *Plemel* positions find support in the scientific community. For instance, the National Research Council states that "[i]t is meaningless to speak of the reliability of DNA typing in general — i.e. without specifying a particular method." *DNA Technology in Forensic Science (Summary)* at 8.

The first *Brown* guideline is the technique's general acceptance in the field. 297 Or at 422. The Supreme Court determined that the peak of tension polygraph test is widely used and is a generally accepted technique. 297 Or at 422. It is apparently taught in every school of polygraphy. 297 Or at 425. Whether the forensic use of RFLP DNA testing is generally accepted in the field is a more problematic inquiry. The majority quotes the Office of Technology Assessment (OTA) as finding that the forensic uses of DNA tests are reliable and valid *when properly performed*. 123 Or App at 185. However, that same body goes on to question the frequency with which forensic RFLP tests are properly performed and interpreted.

> "Setting standards for forensic applications of DNA testing is the most controversial and unsettled issue. Standards are necessary if high-quality DNA forensic analysis is to be ensured, and the situation demands immediate attention." *The Genetic Witness: Forensic Uses of DNA Tests*, Office of Technology Assessment, 10 (1990).

The OTA report recognizes that questions about technical standards and quality assurance remain to be resolved. *The Genetic Witness* at 23. The report, while favorable, does not translate into general acceptance of RFLP's forensic uses.[3] The National Research Council, an equally august body,[4] reports that important questions have been raised about the reliability and validity of forensic RFLP. *DNA Technology in Forensic Science (Summary)*, National Research Council, at 1 (1992). The scientific community is hotly debating the reliability of forensic RFLP testing, and the technique has not yet achieved *general* acceptance.[5] An expert witness for the prosecution admitted that he could not say that the database used in this case was generally accepted in the scientific community.

---

[3] The majority cites figures concerning the use of RFLP in criminal cases, presumably as evidence of the technique's widespread acceptance. 123 Or App at 185. However, *Brown* refers to general acceptance as acceptance by the relevant *scientific* community. 297 Or at 427.

[4] The National Research Council is part of the National Academy of Sciences.

[5] The National Research Council admonishes against premature acceptance of the technique, "lest society and the criminal justice system be unable to benefit fully from advances in science and technology." *DNA Technology* at 6.

In sum, as to the first *Brown* guideline, while the peak of tension test in *Brown* found general acceptance, the same cannot be said of RFLP testing at this time.

The second guideline in *Brown* is the qualification of experts. The Supreme Court held that the two polygraphers who tested Brown were experts because they were state licensed, had special training, and were experienced and prominent in their fields. The Supreme Court noted that state licensing is not a guarantee of expertise. 297 Or at 425-27.

In regard to RFLP, the academic qualifications of the molecular biologists, population geneticists, and statisticians who testify are often excellent. Though many RFLP experts are affiliated with the handful of laboratories in the country that do forensic RFLP testing, potential bias can presumably be revealed at trial. The most serious problem with the qualification of RFLP experts lies with the technicians who perform the highly complex tests and declare matches. Though their jobs involve tremendous responsibility, there is no federal or state oversight of their qualifications. *The Genetic Witness* at 76. The technician who testified in this case testified that her training on how to determine a match consisted of "simple visual instructions * * * of what is alike and what isn't alike."[6] A related problem is the lack of laboratory certification.

Under guideline two, RFLP testing fares better than polygraphy where some categories of expert witnesses are concerned, but questions about the qualifications of the technicians and the laboratories will ultimately diminish the technique's probative value until problems surrounding technician and laboratory certification are resolved.

*Brown* guideline three is the use that has been made of the technique. Use of forensic RFLP testing is neither rare nor widespread. The Supreme Court said that widespread use is not equivalent to general acceptance by the scientific community but has "some" bearing on probity. Guideline three is not particularly helpful in assessing RFLP's probity.

---

[6] The secrecy of laboratory protocols has inhibited oversight. See the discussion of laboratory secrecy under the discussion of guideline four hereafter.

Guideline four is the technique's potential rate of error. Polygraphy's potential rate of error was subjected to lengthy analysis before the Supreme Court concluded that the rate of error could not be established despite a plethora of studies purporting to do just that. 297 Or at 427-33. The majority's discussion of RFLP's reliability is terse. Its conclusion that RFLP is reliable rests on (1) a brief quote from the OTA (sans the OTA's qualifications of its own statement) that DNA testing is valid (2) a statement that the tests results and testing protocol are available for objective review. The majority's discussion of RFLP's reliability for forensic use is inadequate.

According to the OTA, the reliability of RFLP analysis hinges on these factors: procedures used, laboratory performance, laboratory record keeping, quality control and quality assurance. *Genetic Witness* at 7. The OTA report is more concerned with urging the implementation of standards to monitor these factors than in assessing the current state of the field.

Many researchers harbor grave doubts about the technique's reliability. Procedures used and laboratory performance are inadequate, according to Thompson and Ford. At the time of trial there were no state or nationwide standards by which the procedures used by laboratories could be compared or judged. Each lab's procedures were considered trade secrets and are not subject to peer review. Thompson and Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va L Rev 45, 59 (1989). Quality control and assurance are made difficult by the nature of the samples used in forensic RFLP testing. In contrast to DNA samples used in paternity testing, research and medical diagnosis, the samples used for forensic testing are subject to degradation due to age and environmental factors.[7] Samples used in diagnostic tests are

---

[7] "[T]he differences between the scientific technique applied to diagnostics and those same techniques applied to forensics have thus far proven fatal to the reliability of the forensic test." Hoeffel, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 *Stanford Law Rev.* 465 (1990).

plentiful enough to permit repeated testing, another procedural safeguard forensic DNA testing lacks.[8]

In summary, there is no consensus about and no blind study of the reliability of RFLP tests for forensic use. Problems with the databases and the statistics used to interpret the RFLP test results are another problem. At least at the time of trial databases were small, unvalidated and not subject to peer review. Lack of data on reliability reduced the Supreme Court's estimate of polygraphy's reliability in *Brown*. Here, while the lack of data on reliability does not reduce RFLP's probative value to zero, it does diminish it.

The fifth *Brown* guideline is the existence of specialized literature. 297 Or at 433. There is a great deal of specialized literature on the forensic use of RFLP. Most of the law review articles on the subject evidence alarm, while the scientific papers are more evenly divided between acceptance and rejection of current methods until standards and controls are implemented. We note that the National Research Council is worried about premature acceptance of the technique. *DNA Technology in Forensic Science* at 6.

The sixth *Brown* guideline is the novelty of the invention. The Supreme Court defined "novelty" as new or unusual. 297 Or at 434. Newness is hard to define in this context. The technique has been used since 1985, so it is neither brand-spanking new nor hoary with age. The technique is unusual for several reasons. Unlike the well-established use of DNA for paternity tests, there are no controls with RFLP testing.[9] Also, the samples are degraded and subject to contamination, which increases the rate of false positives and false negatives. The need for population genetics also distinguishes RFLP testing from its more established cousin, paternity testing. Another unusual aspect of

---

[8] "Research scientists can tolerate relatively high rates of error and unreliability in their procedures. Scientific experiments which produce a finding of interest are usually repeated, sometimes many times, to be sure they are accurate. * * * In any case, errors tend to stand out because they are inconsistent with scientific knowledge and theory. The situation in a forensic laboratory is quite different. Tests are often not repeated." Thompson and Ford, *supra*, at 56.

[9] In paternity testing, a blood sample from the mother is used as a control.

RFLP testing is that only two laboratories in the U.S. perform the test for forensic purposes. The evidence's admissibility hinges, in part, on the credibility of two for-profit companies who consider their procedures trade secrets.

The seventh *Brown* guideline, the extent to which the technique relies on an expert's subjective interpretation, is somewhat troubling. When the test in this case was performed, uncertified technicians "eyeballed" the data and declared matches on the basis of unvalidated, in-house standards. The same is *not* true of blood testing, ballistics, fingerprinting and other forensic tests. Tests in those areas are public, standardized, and the practitioners are certified. Lifecode's own scientific papers repudiate visual comparisons and suggest that matches be declared by computers. M. Baird et al, *The Application of DNA-Print for Identification of Forensic Biological Materials*, in *Advances in Forensic Haemogenetics* 396-402 (1988).

Summing up the *Brown* analysis of forensic RFLP, it appears that the technique did not have high probative value *at the time of trial.* As the OTA said, the technique has potential for high accuracy, but until the two laboratories implement greater controls and standards, the technique is somewhat undependable in practice. If RFLP is compared with polygraphy point by point, they have approximately the same probative value under *Brown.*

Having assessed the probative value currently possessed by forensic RFLP, we now turn to an OEC 403 balancing test to see if the probative value substantially outweighs the danger of unfair prejudice, confusion of the issues, misleading the jury or considerations of undue delay or needless presentation of cumulative evidence. 297 Or at 438.

In *Brown*, the Supreme Court said that polygraphy presented two dangers: that the jury would overvalue polygraph evidence and that the jury would defer credibility determinations to the polygrapher. 297 Or at 440. In this case, the principal danger is that a jury will overvalue the RFLP test results. The court echoed the concern of *United States v. Addison*, 498 F2d 741, 744 (DC Cir 1974), that scientific evidence has the potential to assume an aura of "mystic infallibility" in the eyes of a lay jury. 297 Or at 440.

Misunderstanding of a polygraph's reliability might divert the jury's attention from direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence. 297 Or at 440.

The majority gives short shrift to the danger that a jury might overvalue RFLP test results. Its discussion of the danger that a jury will overvalue RFLP test results is set out below.

> "The [RFLP] evidence is not infallible, nor would it necessarily be considered as such by the trier of fact. Because of the availability of cross-examination and the defendant's ability to call other witnesses to rebut the opinions expressed by the prosecution's witnesses, the potential problem that the jury may be overly impressed by the aura of reliability of the evidence is lessened. * * * Rather than causing the trier of fact to abdicate its role of critical assessment, it enhances the ability of the jury to perform the its constitutional function." 123 Or App at 186.

The majority presents as self-evident truth the proposition that a jury would not necessarily consider the technique infallible. However, most of the authorities who have considered the issue are worried. As the OTA report states:

> "[B]ecause statistical probabilities introduced in DNA cases are extremely small (sometimes one in billions) and are generally presented — or at least perceived — as an absolute identification, courts must decide if numbers that are introduced can be understood by juries." *The Genetic Witness* at 105.

Studies indicate that juries are overwhelmed by scientific evidence they do not understand. Egesdal, *The Frye Doctrine and Relevancy Approach Controversy: An Empirical Evaluation*, 74 Geo L J 1769, 1790 (1986). Jurors commonly misuse or misinterpret statistical information. Thompson and Schumann, *Interpretation of Statistical Evidence in Criminal Trials*, 11 Law and Human Behavior 167 (1987). The Supreme Court based its holding that admission of polygraphic evidence would divert the jury, in part, on a study of juror behavior. 297 Or at 440. Here, the available evidence suggests that the majority seriously underestimates the problem that juries will abdicate their role when faced with the

extreme complexity of RFLP tests and the statistics used to interpret those tests.

The majority suggests that an opposing party's ability to cross-examine expert witnesses and present its own expert witnesses lessens the "potential" problem that juries will be overly impressed with RFLP evidence. In *Brown*, the Supreme Court considered the opposing party's ability to call expert witnesses not a help but a hindrance, and referred to "time-consuming and confusing battles of expert witnesses." 297 Or at 441. If anything, a battle between opposing armies of molecular biologists, population geneticists, laboratory technicians and statisticians would be more time-consuming and more confusing than a battle between polygraphers.

The Supreme Court also cited prejudice to the administration of justice as a consideration under OEC 403. It stated that admission of polygraphic evidence would hamper justice in Oregon because at that time there were 35 licensed polygraphers in Oregon and over half a million criminal cases. 297 Or at 441. The court quoted with approval a federal case holding that the time required to analyze polygraphy tests would be "virtually incalculable." 297 Or at 442.

Prejudice to the administration of justice is likewise a problem with RFLP testing. The costs of providing expert witnesses to the state and indigent defendants would be high.[10] And, debates over RFLP tests would be time-consuming at a time when trial court dockets are full.[11] While prejudice to the administration of justice is not a dispositive issue in OEC 403 analysis, practical problems deserve the same attention in this case as they received in *Brown*.

Besides the problems of juror over-reliance and undue delay, the Supreme Court considered a third problem with polygraphy: it directly comments on witness credibility. This third problem is not present with RFLP analysis. However the problems shared by RFLP analysis and polygraphy: juror confusion and over-reliance, and prejudice to the

---

[10] Eleven experts testified at the trial, at state expense.

[11] In this case, it took the court 13 months to rule on the admissibility of forensic RFLP. Expert witness took the stand 17 times in the pre-trial hearings alone.

administration of justice, are arguably greater with RFLP testing. Furthermore, forensic RFLP has questionable reliability *in practice*. Reliability was the paramount concern in *Brown*. 297 Or at 418 n 6. After weighing the three considerations under OEC 403 against polygraphy's probative value, the Supreme Court found that the probative value of polygraph evidence was "far outweighed" by the reasons for its exclusion.

In regards to forensic RFLP, it appears that the probative value was not high in this case. And, however great the temptation to gloss over the reasons for exclusion: overvaluation by the jury, jury confusion over statistics, expense and delay, those problems cannot be ignored. I conclude that the reasons for exclusion substantially outweighed probative value.

I dissent.

Warren and Durham, JJ., join in this dissent.