Argued and submitted November 30, 1992, remanded in part; otherwise affirmed November 17, 1993, reconsideration denied May 18, petition for review pending 1994

STATE OF OREGON,
*Respondent,*

*v.*

ROBERT WALLACE LYONS,
*Appellant.*

(10-89-08273; CA A68348)

863 P2d 1303

Sally L. Avera, Public Defender, argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

De MUNIZ, J.

---

* Leeson, J., *vice* Buttler, J., retired.

**De MUNIZ, J.**

A jury found defendant guilty of aggravated murder, murder, sexual abuse in the first degree and burglary in the first degree. ORS 163.095; ORS 163.115; ORS 163.427; ORS 164.225. The court merged the murder convictions for sentencing purposes and sentenced defendant to life in prison without the possibility of parole on the aggravated murder charge. On the burglary charge, the court entered a conviction and sentenced defendant to a term of 20 years, to be served concurrently.

Defendant makes three assignments of error. First, he contends that the court erred by admitting the DNA[1] evidence that linked him to the murder scene. Second, he contends that the court erred by failing to disclose nonexculpatory material contained in the mental health records of a person who defendant claims committed the crimes. Third, defendant contends that the court erred by merging the murder charges for sentencing purposes only and by refusing to merge the burglary charge with the aggravated murder conviction.

Because a jury convicted defendant, we state the facts in the light most favorable to the state. *State v. Langley,* 314 Or 247, 249, 839 P2d 692 (1992); *State v. Cervantes,* 118 Or App 429, 431, 848 P2d 118, *rev allowed* 317 Or 485 (1993).

In August, 1989, defendant moved into Room 27 at the Stage Stop Inn in Eugene. The victim, Lori Stabenow, and her five-year-old daughter lived in Room 5. Stabenow's mother, Sharon Jones, managed the motel and lived in an apartment next to it. Stabenow's brother, Leon Elliot, lived in Room 34 with his girlfriend, Sandra Stemm, and his daughter.

On September 22, Stabenow and her daughter joined Elliot and Stemm for a pizza dinner in Elliot's room. After dinner, Stemm left to relieve Jones at the motel office. An hour later, defendant arrived at Elliot's room with a half gallon bottle of whiskey. He asked Elliot and Stabenow if they wanted to have a few drinks. They drank and talked for several hours. Stemm returned shortly after 10:00 p.m.

---

[1] Deoxyribonucleic acid.

Around 11:30 p.m., Elliot told Stabenow that she had had enough to drink and that he thought she should not have any more. Stabenow became angry and left with her daughter.

Stabenow's daughter went to Jones' room and asked if she could spend the night, because her mother had been drinking. Jones took the girl in, but Stemm retrieved the girl and took her back to Elliot's room. Defendant and Elliot left the motel, went elsewhere and drank some more. They returned around 2:00 a.m., and Elliot watched as defendant departed in the direction of his room.

Shortly before noon, defendant went to Elliot's room. He asked Stemm if she or Elliot had seen his wallet. Then, he approached Jones, who was working in her yard. He told her that he had left his wallet in Stabenow's room and asked Jones if she knew whether Stabenow was awake. She did not know. Jones telephoned Stabenow's room, but there was no answer. Around 3:00 p.m., she went to Elliot's room and asked Stemm to go with her to Stabenow's room. They went to Stabenow's room and knocked on the door, but no one answered. They noticed that the molding was separated about a quarter of an inch from the door frame. Jones used her master key and opened the door.

Stabenow was lying on the bed with only a "wrap" around her neck. Blood was coming from her mouth and there were bite marks on her body. Jones closed the door and ran screaming to Elliot's room. Elliot went to Stabenow's room and broke the door open. He covered her body with the bedspread and called 911 to summon help. A paramedic arrived and examined the victim. She was not breathing, had no pulse and her body was cold. The paramedic concluded that he could not resuscitate her.

The police soon arrived to investigate. They found defendant's wallet under the foot of Stabenow's bed. Bekkedahl, a criminalist for the Oregon State Police, found feces on the victim's legs, on her buttocks and on the bed beneath her body. Her clothing was stained with blood, and there were numerous bite marks from her shoulder down to her leg. She had a black eye and her body was bruised in many places. Her anus and rectum were torn, apparently by an object the size of a fist. She had been strangled to death.

Bekkedahl removed loose hairs from the victim's body, her clothing, and her bed. He also took samples of saliva from the bite marks for testing. While defendant was in custody, samples of his hair were taken for comparison. Bekkedahl tested the hairs under a microscope. He concluded that the morphology (shape) of five of the hairs taken from the victim's body was consistent with that of defendant's pubic hairs. Bekkedahl tested the saliva samples taken from bite marks on the victim's body. He determined that a person with type-A blood, who secretes A antigen into body fluids other than blood, left the saliva residue in the bite marks.[2] Bekkedahl tested a sample of defendant's blood and determined that he is a type-A secretor.

Forensic odontologist Levine examined the bite marks on the victim's body. He compared the marks with wax models that had been made from defendant's teeth. He testified that some of the marks on the victim's body were not suitable for comparison, but four could be compared. Levine had no doubt that the wax models were made from the same person whose teeth marks appeared on the victim's body.

Blake, a forensic evidence consultant, performed DNA tests on the hair and saliva samples that had been removed from the victim's body. He used a method known as polymerase chain reaction (PCR) to perform the tests. He also tested samples of the victim's hair and defendant's hair using the PCR method. Blake determined that defendant had the same gene type as the donor of two of the hairs removed from the victim's body. He testified that that gene type occurs in approximately two to three percent of the Caucasian population. Blake further testified that the victim had a different gene type. Testing of the saliva samples was inconclusive.

■ In his first assignment, defendant contends that forensic DNA evidence developed by the PCR method is inadmissible, because it is not sufficiently reliable and is too complex and confusing to be probative and helpful to the trier of fact. In *State v. Futch*, 123 Or App 176, 186, 860 P2d 264 (1993), we analyzed forensic DNA evidence under OEC 401, OEC 702 and OEC 403 by applying factors utilized by the

---

[2] According to Bekkedahl, 32% of the population secretes the type-A antigen into body fluids other than blood.

Supreme Court in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and concluded that forensic DNA evidence in general was admissible. We also concluded that the particular DNA evidence in that case was admissible. 123 Or App at 190. Here we determine the admissibility of forensic DNA evidence produced by the PCR method.

We begin with a very basic discussion of DNA.[3] DNA carries the hereditary information in all living things. In most organisms, including humans, DNA is located in structures called chromosomes, which are found in the nuclei of cells.[4] DNA is composed of building blocks called nucleotides. Each nucleotide has three components: a sugar molecule (deoxyribose), a molecule of phosphoric acid, and a nitrogenous base. The phosphoric acid and sugar component of each nucleotide is the same, but the nitrogenous base may be one of four different kinds: adenine, cytosine, guanine and thymine, which are usually abbreviated A, C, G and T.

A DNA molecule is composed of two strands of nucleotides, and the strands are held together by hydrogen bonds and structural proteins. A DNA molecule is extraordinarily long, and is folded upon itself to form a chromosome. If the DNA strands in a chromosome are unfolded, the two strands appear parallel to each other and are twisted into a double helix. The double helix is similar to a spiral staircase or ladder. At the side of each step is a single nucleotide. On the opposite side of the step is another nucleotide. Thus, the nucleotides in a DNA molecule occur in pairs.

The nitrogenous bases of a nucleotide pair are complementary: cytosine is always paired with guanine, and adenine is always paired with thymine. Consequently, if the sequence of bases on one strand is known, then the sequence of bases on the complementary strand may be deduced.[5] The complementarity of base pairs along the two DNA strands provides the mechanism by which DNA is replicated during cell division. It also provides the mechanism for translating the DNA code into a series of amino acids, the building blocks

---

[3] Our discussion is taken from Lehninger, *Short Course in Biochemistry* (1973).

[4] Some types of cells, *e.g.*, red blood cells, do not have nuclei.

[5] For example, if a sequence on one strand is C-C-G-T-A-T, then the corresponding sequence on the complementary strand would be G-G-C-A-T-A.

of protein, which are, in turn, the chemical manifestations of heredity.[6]

A series of nucleotides that codes a particular protein is called a gene. Each chromosome may contain several thousand genes. Not all of the DNA in a chromosome codes for proteins; some nucleotide sequences between genes on a chromosome are non-coding. Because an organism has a tremendous number of genes, and each gene contains a tremendous number of nucleotides, the potential for genetic variation between individuals is so great that, except for identical twins, each individual is genetically distinct. DNA typing, regardless of the method, depends on this great variation.

Next, we briefly describe the PCR replication method.[7] The complementary strands of DNA in a chromosome are joined by hydrogen bonds. Hydrogen bonds are relatively weak and can be broken by heating. The two complementary strands can thus be separated or "denatured" by heating the DNA. Because the nitrogenous bases on a DNA strand are always complementary, a denatured DNA strand forms a template that allows the manufacture of a new strand that is identical to the complementary strand.

The denatured strand can then be exposed to a primer[8] that will hydrogen bond to a sequence of nucleotides on the denatured strand, if it has a nucleotide sequence that is complementary to the sequence of the primer. Two primers are used to locate and bind to nucleotide sequences that are known to appear at the ends of a target DNA sequence. Once the primers are bound to the ends of a target sequence on the sample, a gap between them will exist where the complementary strand was attached before denaturation. An enzyme called polymerase can be used to attach a free nucleotide to the end of the primer. Because the nitrogenous bases of

---

[6] Proteins are of two basic types: some are structural, while others (enzymes) function to catalyze specific chemical processes within the body. These structures and chemical processes contribute to the observable characteristics of an individual.

[7] This description of the PCR method is taken from Arnheim, White & Rainey, *Application of PCR: Organismal and Population Biology*, BioScience 174, March, 1990.

[8] A primer is a short synthetic DNA strand with known nucleotide sequences.

nucleotide pairs are always complementary, the nucleotide that is added to the end of the primer is necessarily complementary to the nucleotide on the sample DNA strand bound to the primer.

Polymerase can then add another nucleotide to the nucleotide that has just been added. The second nucleotide is necessarily complementary to the next nucleotide on the sample strand. Repeated additions of free nucleotides fills the gap between the two primers and a new strand of DNA is created. The new strand is complementary to the sample strand, and thus identical to the other denatured strand of the original DNA sample.

The replication process can be repeated by reheating the sample to cause denaturation. Primers attach to specific nucleotide sequences in the denatured strands of DNA. Polymerase adds free nucleotides, one by one, to fill the gap between the primers, and another copy of the target sequence of DNA is made. Eventually, this "amplification" produces a sufficient quantity of a relatively pure sample for an investigator to determine the gene type of the sample. Here, Blake typed the sample by using a commercial identification package that utilized reverse dot blotting.[9]

In reverse dot blotting, probes are attached to a nylon membrane, and the membrane is immersed in a solution containing the PCR product.[10] For the reasons discussed above, the amplified DNA will only bond to a complementary probe. Once the amplified DNA and probe have bonded together, they can be exposed to a reactive solution that will cause a reporter molecule on the probe to "light up" or change color. This "lighting up" allows the investigator to determine the gene type of the sample and compare it with the gene types of other samples. In this case, Blake reached his conclusions by such gene type comparisons.[11]

---

[9] *See generally* National Research Council, *DNA Technology in Forensic Science* 42, 67-69 (1992).

[10] A probe is a single strand of DNA tagged with a reporter molecule that is used to detect a particular complementary DNA strand.

[11] Blake testified that the DQ-Alpha subtype of two hairs found on the victim's leg was 2,2 and that he determined from blood and hair reference samples that defendant is also 2,2 DQ-Alpha subtype. He further testified that the victim was a 1,1,2 DQ-Alpha subtype.

With that background in mind, we turn to the admissibility of DNA evidence produced by the PCR method. In *Brown*, the Supreme Court described the analysis under the "relevancy" test as follows:

"To determine the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702, the following seven factors are to be considered as guidelines:

"(1)   The technique's general acceptance in the field;

"(2)   The expert's qualifications and stature;

"(3)   The use which has been made of the technique;

"(4)   The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert.

"The existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702." 297 Or at 417-18. (Footnotes omitted.)

Here, there is no dispute concerning two of the *Brown* factors. Defendant concedes that the state's expert witness, Blake, was qualified to testify and that the PCR method does not rely on the subjective interpretation of the expert. We, therefore, confine our analysis to the technique's general acceptance in the field, the use that has been made of the technique, the potential rate of error, the existence of specialized literature and the novelty of the scientific method.

Defendant concedes that the PCR method is generally accepted among scientists, but argues that the method is not generally accepted in the field of forensics. He argues that evidence produced by the PCR method should be inadmissible, because the PCR method has been used too infrequently in forensic contexts to gain general acceptance and experts disagree about whether the PCR method is appropriate for forensic use. These arguments concern the use that has been made of the technique, which we address below in our discussion of the third *Brown* factor.

■     The first *Brown* factor concerns the technique's general acceptance within the particular scientific field. In *Brown*, the Supreme Court examined the peak of tension test for general acceptance within the field of polygraphy. *State v. Brown*, 297 Or at 422-25. Our inquiry is whether the PCR method is generally accepted within the field of genetics and by scientists working with DNA. Both parties' experts indicated that there is general acceptance among those conducting DNA research that the PCR method accurately and reliably replicates small samples of DNA.[12] There is no dispute that the PCR method is generally accepted within the field.

We now examine the particular use of the PCR method, the third *Brown* factor. In *Brown*, the Supreme Court noted that polygraph tests were routinely used to investigate criminal activity and had been used in employment situations as well. 297 Or at 427. When the court considered the admissibility of the DNA evidence in this case, the PCR method had been used forensically in eight states and admitted into evidence in a number of states.[13] At least two state crime laboratories, several private forensic laboratories and the FBI have adopted the PCR method.

■     There is, however, disagreement among experts about whether the PCR method is appropriate for forensic use. The disagreement centers primarily on the fact that samples obtained at the crime scene are often produced and recovered under adverse conditions that can result in various forms of contamination before the sample ever reaches a laboratory. The potential for contamination is present in the collection, identification and retention of most forms of forensic-type evidence. The potential for contamination presents an "open field" for cross-examination at trial, but does

---

[12] The National Research Council has noted that "[t]he theory of PCR analysis * * * is scientifically accepted and has been accepted by a number of courts." National Research Council, *supra*, at 70. Indeed, Kary B. Mullis was recently named a co-recipient of the 1993 Nobel Prize for chemistry, for inventing the PCR method.

[13] *E.g., Trimboli v. State*, 826 SW2d 953 (Tex Cr App 1992); *Spencer v. Com.*, 393 SE2d 609 (Va 1990), *cert den sub nom Spencer v. Virginia*, 498 US 908 (1990); *State v. Williams*, 252 NJ Super 369, 599 A2d 960 (1991); *Clarke v. State*, 813 SW2d 654 (Tex App 1991), *aff'd* 839 SW2d 92 (Tx Cr App 1992), *cert den* ____ US ____, 113 S Ct 1611, 123 L Ed 2d 172 (1993). We realize that some of these cases used different tests for determining admissibility.

not indicate that the PCR method is inappropriate for forensic use. The PCR method was, and is, being used in an increasing number of forensic situations. The absence of widespread forensic use of the PCR method is not determinative of the admissibility of DNA evidence produced by the method. *See State v. Brown, supra,* 297 Or at 427.

■     Next, defendant argues that the potential rate of error is uncertain, because the user protocols for the PCR method do not eliminate the possibility of human error and the protocols cannot prevent certain types of errors. The possibility of human error is present during many different types of scientific analysis. However, that possibility does not prevent scientists from relying on scientific analysis if safeguards against such errors exist and are followed. Here, Blake testified that he followed the protocols for the PCR method and conducted control tests to assure the validity of his work.[14] Defendant asserts that even proper human performance of such protocols could not prevent the problem of allelic dropout during denaturization and its detection. Allelic dropout can occur when complementary nucleotides do not separate completely during denaturization and thus are not replicated. Blake testified that he was aware of the possibility of allelic dropout. He prevented allelic dropout by using a temperature setting of 94 degrees Celsius in his denaturization equipment and maintaining that temperature longer than required by the protocols. Other experts testified that allelic dropout could be avoided by using temperatures above 90 degrees Celsius for one minute instead of thirty seconds during denaturization.

■     Defendant also argues that, because scientists with financial or professional interests in the success of the PCR method produced much of the literature about the method, there is no specialized literature in the field. Defendant's argument is an attack on the credibility of those articles, not their existence. There is no dispute that scientific articles

---

[14] For each potential cause of error raised by defendant's expert, Blake testified about procedures that he used to prevent such errors. Blake used a variety of external controls to prevent contamination and to assure complete denaturization. He also used internal controls to check for errors in the PCR method. For example, during typing of the samples, he used an "all control" strip that would light up if secondary DNA was present. He also processed control samples with known gene types.

concerning the PCR method exist and that peer-review journals published many of those articles. A private company performing the PCR method has published a bibliography listing some 4,000 scientific articles and publications relating to PCR. That literature describes use of the PCR method in medical, plant and animal research, and by the FBI.

■ Defendant accepts the trial court's finding that the PCR method is novel, but does not offer an argument why the novelty of the technique should make evidence produced by the method inadmissible. In *Brown*, the Supreme Court said the polygraph test was novel, because it was the only scientific evidence utilizing instrumentation that attempted to convey to a jury a witness' deceptiveness or truthfulness. 297 Or at 436. The Supreme Court noted that most federal and state courts had rejected the admission of such evidence. 297 Or at 436. The PCR method may be novel, only in the sense that it is new. However, the PCR method does not present the problem that polygraphy did of usurping the trier of fact's role of assessing deceptiveness and truthfulness of witnesses.

Moreover, the state has presented several reasons why the novelty of the procedures used here may actually assist the trier of fact by eliminating potential causes of error associated with other methods of producing DNA evidence. The reverse dot blotting technique is novel, because it is newer than another gene identification method called Southern blotting that is often used with the RFLP method. Reverse dot blotting improves the accuracy of gene identification by reducing human errors that are associated with the Southern blot method. In addition, Blake used a commercial package of probes to perform the reverse dot blotting, rather than preparing the probes himself. Use of the commercial package enhanced convenience and sterility by reducing human handling.

■ Finally, defendant argues that DNA evidence produced by the PCR method is not helpful to the trier of fact, because the presentation of such evidence is so time-consuming, complex and confusing that jurors are distracted from the central issues of the case. Although the PCR method is, indeed, complex, the result is expressed in easily understood terms and does not purport to positively identify the donor of the sample found at the scene. Further, as illustrated

in this case, the presentation of the PCR method DNA evidence at trial is not so complex and confusing as to distract jurors from the central issues in the case. Neither is it too time-consuming. Only two experts, one for the state and one for defendant, testified at trial. Their combined testimony comprises less than 200 pages of transcript.

In the light of our holding in *Futch* that DNA evidence is generally admissible, and based on our evaluation of the various factors identified in *Brown*, we conclude that PCR method DNA evidence is relevant and helpful to the trier of fact. That, however, does not end the inquiry.

■■ Although the evidence is relevant and useful to the trier of fact, OEC 403 may require its exclusion if the probative value of the evidence is substantially outweighed by the dangers identified in the rule.[15] Defendant makes no argument for the exclusion of the evidence under OEC 403, and we find nothing about the PCR method or the presentation of the results of the PCR method that would undeniably cause jurors to misuse, misinterpret or overvalue the results. Unlike the RFLP method at issue in *Futch*, the results of the PCR method are not expressed in terms of statistical probabilities capable of creating the aura of absolute identification. Instead, the results are expressed as a conclusion that the identified gene type common to the sample and the defendant is one found in a certain percentage of a population group. We conclude that the probative value of PCR method DNA evidence is not outweighed by any of the potential dangers addressed in OEC 403. PCR method DNA evidence is admissible and was properly considered by the jury.

■ In his second assignment, defendant asserts that the court erred in failing to disclose to the defense all of the material contained in mental health records of a person named Crook who allegedly confessed to the homicide. At trial, the court allowed a cab driver, who drove Crook from Sacred Heart Hospital to the Stage Stop Inn, to testify that Crook said that he had murdered a girl at the Stage Stop Inn.

---

[15] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The state was permitted to rebut the implication that Crook was responsible for the homicide by showing that Crook's teeth, saliva, hair and blood did not match the physical evidence at the scene. Police officers also present with Crook and the cab driver denied that Crook had confessed to them.

Defendant subpoenaed Crook's mental health records for use at trial. After conducting an *in camera* review of the records, the court concluded that there was "nothing of an exculpatory nature" in the records and refused to permit disclosure of the records to the defense. On appeal, defendant has apparently abandoned his claim that the records contain exculpatory material and now claims that, under the due process clause, "[h]e was entitled to receive *all* unprivileged materials, whether exculpatory or not." (Emphasis in original.) The state points out that a number of confidentiality statutes prohibit disclosure of much of Crook's records. We need not analyze the application of those statutes to resolve this issue. Even if the records contain material not subject to an evidentiary or statutory privilege, any error in not disclosing that information is harmless, because only exculpatory information would have been relevant and admissible at trial. Defendant's trial could not have been unfairly prejudiced by the court's refusal to disclose nonexculpatory material in the records.

Defendant argues, in a supplemental brief, that the trial court erred because it did not sentence him according to the sentencing guidelines. The trial court did not err. Defendant was convicted of crimes that occurred on September 23, 1989. The sentencing guidelines apply to convictions for felonies committed on or after November 1, 1989, and do not apply retroactively. ORS 137.120(2); *State v. Haydon*, 116 Or App 347, 350, 842 P2d 410 (1992).

Defendant's final assignment challenges the court's entry of separate convictions for aggravated murder (count 1), murder (count 2) and burglary (count 3). The state agrees that, as a matter of law, the murder and aggravated murder counts merge, because they do not contain disparate elements. However, the state contends that the court did merge those counts. The judgment states that, "The Court finds for *the purpose of imposing sentence* that the crime charged in Count 2 of the Indictment merges with Count 1 of the

Indictment." (Emphasis supplied.) Merger of the murder counts should have been for purposes of conviction, not just sentencing. We, therefore, remand for entry of an amended judgment stating that the murder counts merge for conviction and sentencing purposes.[16]

■ The state, however, disagrees with defendant's claim that a separate conviction and sentence cannot be entered on the burglary. Defendant's sole argument for merger of the burglary and aggravated murder counts appears to be that, because burglary was one of the felonies alleged in count 1 of the indictment charging defendant with aggravated murder, "[c]ount 3 [burglary] is entirely subsumed * * * [and] must be merged with the greater conviction for aggravated murder." The jury returned a verdict finding defendant guilty of aggravated murder on the basis of its findings that defendant committed or attempted to commit sexual abuse in the first degree and burglary in the first degree. The state argues that the burglary conviction does not merge with the aggravated murder conviction, because the burglary was completed before the murder occurred and the murder encompassed commission of a different underlying offense, sexual abuse in the first degree. We agree with the state for slightly different reasons.

In *State v. Fish*, 282 Or 53, 577 P2d 500 (1978), the Supreme Court concluded that separate convictions and sentences for felony murder and the associated or underlying felony of burglary could not be entered, because

> "[i]t is apparent that the legislature took the felony into account when it set the penalty for felony murder. It would be unreasonable to assume that it intended to provide for double punishment by authorizing an additional sentence for the felony." 282 Or at 56.

We have applied that reasoning to aggravated felony murder cases decided both before and after the enactment of ORS 161.062 and ORS 161.067 (the anti-merger statutes).[17] *See*

---

[16] Defendant need not be present for the entry of an amended judgment.

[17] The legislative policy expressed in the anti-merger statutes (ORS 161.062 and ORS 161.067) is that

> "criminal records accurately reflect all crimes actually committed and that a person who commits multiple crimes by the same conduct or during the same criminal episode should have a criminal record reflecting each crime committed

*State v. Wille*, 115 Or App 47, 60-61, 839 P2d 712 (1992), *aff'd in part on other grounds*, 317 Or 487, 858 P2d 128 (1993); *State v. Atkinson*, 80 Or App 54, 722 P2d 9, *rev den* 302 Or 36 (1986); *State v. Fisher*, 80 Or App 45, 51, 721 P2d 854, *rev den* 302 Or 36 (1986). In *Wille*, the state conceded that the reasoning in *Fish* remained valid after the enactment of the anti-merger statutes, as to the felony underlying the conviction and sentence for aggravated murder. However, it did not concede that that reasoning was applicable to the two other felonies underlying the two other aggravated murder verdicts that the court merged for sentencing purposes. Citing *State v. Fish, supra*, and *State v. Atkinson, supra*, we held that "the trial court also erred in entering convictions for any of the underlying felonies." *State v. Wille, supra*, 115 Or App at 61. (Footnote omitted.) On review, the Supreme Court specifically noted that "[t]he propriety of the Court of Appeals' vacating defendant's convictions of burglary in the first degree and kidnapping in the second degree is not before the court." *State v. Wille*, 317 Or at 489 n 1.

It is not necessary for us to reexamine the correctness of that aspect of our decision in *Wille* to conclude that merger of the burglary conviction is not required here. The reason for merger of the underlying felony and aggravated felony murder is that

"it is clear the legislature took the aggravating circumstances underlying aggravated felony murder into account when it prescribed the penalty for that offense. There is no indication that it intended to enhance the penalty further by authorizing convictions and sentences for other crimes for which separate convictions and sentences would not otherwise be permitted." *State v. Fisher, supra*, 80 Or App at 51.

That reasoning has no application here. The jury found that both burglary and sexual abuse were the predicate felonies supporting its aggravated murder verdict. The commission, or attempted commission, of only one of those felonies is all that is necessary to support the aggravated murder verdict. Implicit in the trial court's decision to enter a separate conviction and sentence for burglary is the conclusion

rather than only a single conviction which would not accurately portray the nature and extent of that person's conduct." *State v. Crotsley*, 308 Or 272, 276-77, 779 P2d 600 (1989). (Footnote omitted.)

that sexual abuse constituted the predicate for the aggravated murder conviction and sentence. Defendant's conviction and sentence for aggravated murder does not include punishment for the burglary. The trial court did not err in entering a separate conviction and sentence for burglary.

Remanded for entry of amended judgment merging murder counts for purposes of conviction and sentence; otherwise affirmed.